UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION


James Williams,                                             Case No. 3:14-cv-718

                        Plaintiff

        v.                                                  MEMORANDUM OPINION


OmniSource Corporation, et al.,

                        Defendants



## I. BACKGROUND

James G. Williams was hired by OmniSource Corporation in March 2007. Williams was

employed as a maintenance mechanic at the company's Hill Avenue facility in Toledo, Ohio. He

became a member of the International Brotherhood of Teamsters Local 20 after being employed

with OmniSource for sixty days. As a member of Local 20, Williams received a copy of the

applicable collective bargaining agreement between OmniSource and the Union. David Dawson

was hired by OmniSource in December 2012 and was the maintenance supervisor for the Hill

Avenue facility during the events at issue.

Williams contends he was harassed by Dawson and other employees as summarized in the

complaint's statement of relevant facts:

> 6. Plaintiff states that he was employed by Omnisource as a maintenance
> worker/mechanic. At times, his supervisor, Dave Dawson, has grabbed, pushed and
> pulled him while working. He has screamed at Plaintiff and chased him with his
> arms extended. Specifically, Plaintiff states on one occasion, David Dawson put his
> hands on Plaintiff from behind when Plaintiff was holding a lit torch.

7. Plaintiff states that on another occasion, Dave Dawson chased Plaintiff around with a forklift. In the past, Hector Munoz, a co-worker, has told Plaintiff he is an "asshole," and is "worthless," told Plaintiff to "suck my penis," and threated Plaintiff that he would "screw" Plaintiff "in the anus," in the presence of Dave Dawson, who took no action as a result. Management was aware of Munoz's harassment, which occurred on a daily basis.

8. Plaintiff states that despite these actions being witnesses by other employees and his supervisor and Plaintiff's reports of the conduct to the Plant Manager, no disciplinary action was taken against Defendant Dawson.

9. Thereafter, on September 17, 2013, Defendant Dawson was following Plaintiff and harassing him. Dawson approached Plaintiff and demanded his resignation. Plaintiff states that he refused to resign, and felt cornered by Dawson and another employee. He smacked a nearby railed [sic] and stated that Dawson made him sick.

10. Another Supervisor then was paged and appeared with an off duty Toledo Police Officer, who escorted Plaintiff from the property. Plaintiff was suspended until the situation was "figured out." Plaintiff then suffered a panic attack, and was hospitalized for four days.

11. Nine days later, Plaintiff states that he was again requested to resign his employment. He refused.

12. The following day, Plaintiff was arrested at his home following a police report being filed by Dawson and Omnisource. Plaintiff states that the statements contained in the police report are false.

(Amended Complaint, Doc. No. 24 at pp. 3-4).

Plaintiff was subsequently terminated from employment from OmniSource and contends Local 20 did nothing to assist him.

Based upon this background, Williams initiated this litigation asserting the following claims: (1) assault and battery against OmniSource and Dawson; (2) negligent hiring, detention, and supervision against OmniSource; (3) disability discrimination under the ADA, 42 U.S.C. § 12112(a) and O.R.C. § 4112.02(a)(13) against OmniSource; (4) negligent or intentional infliction of emotional distress, or both against OmniSource and Dawson; (5) defamation against OmniSource and Dawson; (6) invasion of privacy against OmniSource and Dawson; (7) breach of the collective bargaining agreement under 29 U.S.C. § 185(a) against OmniSource; and (8) breach of duty of fair representation against Local 20.

This matter is before me on the Defendants' motions for summary judgment (Doc. Nos. 35 and 37), Plaintiff's opposition (Doc. Nos. 38 and 39), and Defendants' replies (Doc. Nos. 43 and 44). This Court has jurisdiction pursuant to 28 U.S.C. § 1331. For the reasons that follow, the Defendants' motions are granted.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if the movant demonstrates there is no genuine dispute of material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). All evidence must be viewed in the light most favorable to the nonmovant, *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 390 (6th Cir. 2008), and all reasonable inferences are drawn in the nonmovant's favor. *Rose v. State Farm Fire & Cas. Co.*, 766 F.3d 532, 535 (6th Cir. 2014). A factual dispute is genuine if a reasonable jury could resolve the dispute and return a verdict in the nonmovant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A disputed fact is material only if its resolution might affect the outcome of the case under the governing substantive law. *Rogers v. O'Donnell*, 737 F.3d 1026, 1030 (6th Cir. 2013).

## III. RELEVANT FACTS

Williams testified he taught Dawson how to do work orders after Dawson began working at OmniSource. (Doc. No. 36-9 at p. 67) Williams stated he did not like Dawson. (*Id.* at p. 73). He also testified the harassment by Dawson began about several months after Dawson became his supervisor. (*Id.* at p. 79). Williams stated he was harassed by Dawson beginning in the spring of 2013 at which time Dawson's father was dying. (*Id.*) Dawson's father passed away on June 6, 2013. (*Id.*) All of the relevant events occurred in 2013.

Williams complained that Dawson would harass him by getting "right in his ear," follow him around, and startle him. These incidents were described by Angelo Alfaro, a former co-worker:

Q:      All right.  Did you every observe anything as to how, regarding how Mr. Dawson treated Jim Williams?

A:      All I seen was – I called Jim on the radio and said I needed hydraulic fluid in my forklift.  He said, bring it up.  I took it up there.  We opened it up together, a little chitchat, bullshit, and then Jim went over to grab some hydraulic fluid and Dave Dawson walked up and squatted down when Jim was putting oil in and, I mean, got right in his ear.  You could say, what, not even 18 inches from his ear.  It was not a whisper.  It was not a yell, but it was like, Jim, how long is this going to take.  Is it going to take you long.  I need you over here.  I need you to do this.  I put you to do that.  Jim was like, give me a minute.  Let me put the oil in here and I will be right with you.

Dawson continued to be in his ear and telling him, hey, how long is this going to take Jim.  Can Angelo do it.  I am like, I can't do it.  I'm not a maintenance man.  Jim got up and walked around to the other side of the lift.  Dawson was right on his tail.  He came right around again, 18 inches away from his ear and started going again.  Jim, how long is this going to take you.  Jim, how long is this going to take you.  Jim said, just let me get this done.  I will be right with you.  So Jim walks around and he comes back over.  Dawson, again, still on his tail and this probably went on – he went on the lift probably three times.

Q:      Did Mr. Williams get loud or –

A:      No.

(Doc. No. 36-1 at p. 2).  Alfaro also described a second incident:

A:      Another time, I will say this is probably a couple of days later, maybe, a week at the most, I was driving the forklift in to get serviced.  Jim was on the left side of the maintenance room.  He was torching something.  I don't know what he was torching but he was cutting something with a torch.  Mr. Dawson come up on him.  He wasn't running or anything or anything like that.  He just walked up to him and grabbed Jim and startled him and said Jim.  And then Jim fell back with the torch.  That's when Jim got mad.  He said, you can't be grabbing people like that.  I could have hurt somebody or hurt myself with this.  That's when I just turned and walked out.

(*Id.* at pp. 2-3).  Mr. Alfaro also testified he experienced being startled by Dawson and advised him to stop this behavior.  (*Id.*)  Alfaro agreed that Williams never complained to him about being mistreated by Dawson.  (*Id.* at p. 4).

The same incident with the torch was described by plant manager, Jon Kinsman:

A: I was doing my normal rounds with the golf cart and then I had, Dave Dawson was on the golf cart. And we were coming up. I usually take rounds all around the yard. That particular day we came across – Jim was sitting and torching and I stopped the cart and told Dave that again he needed to have a shield on. He didn't have his shield on. He came back from behind and tapped James on the shoulder. And as soon as he touched him on the shoulder James jumped up, turned around, and got really, really – his demeanor was just really, like mad, just that quick and I said, James I says, look, you need to calm down. He said something like, the guy does not have to grab you. I said, James, he didn't grab you. He tapped you.

I said, if anything, I said, he should have went around to your peripheral vision or come straight on to get your attention. Because I used to be an operator. I know when somebody came up from behind me and tapped me usually believe it or not, I came around with a full swing, if somebody came up behind me. That's a reflex for me. I told him he had to be peripheral or in front. He kept getting loud. Obviously, there were some other people inside of the maintenance shop. I said, James, let's go inside the office. Let's talk in there.

So we all went in there. James was saying, well, you know, you didn't have to grab me. I said, look, he didn't grab you. I asked him if he wanted his union steward at the time, too, and he said, no, not really. I want to get back to work. I said ok. But I said, are you sure you don't want your steward because, I said, obviously you're pretty upset about this. But usually when these guys get upset, the first thing I -- if I take them in the room I ask them if they want their steward there. He said, no, I just want to get back to work.

(Doc. No. 36-5 at p. 2).

On September 13th, Williams recounted an incident with a baler getting jammed. Williams was directed by Dawson to remove the belt from the baler. (*Id.* at 84). Williams asked who was responsible for the situation and was given an explanation by co-worker Ken Samples. (*Id.*) Williams testified there was a discussion regarding the baler and that he (Williams) became "loudly verbal but I wasn't yelling." (*Id.* at p. 4).

The incident was reported to Krista Zsiros, the Human Resources Manager for OmniSource. Zsiros investigated and collected statements by employees who witnessed the incidents. (Doc. No. 36-11 at ¶ 5). The unsigned statement of employee Jon Dale indicated the arguing between Williams, Hector Munoz, and Ken Samples lasted 45 minutes and that Dawson tried to stop Williams from arguing. (*Id.* at Exh. A, p. 1). Statements by Munoz and Samples

characterized Williams as "getting out of control going off on everybody," and "unprofessional and belligerent." (*Id.* at pp. 3-4).

Williams called off work on Monday, September 16th to take care of issues related to his father's estate. (*Id.*) He returned to work on Tuesday, September 17th.

Upon his return to work, Williams contends he was confronted about resigning. (Doc. No. 36-9 at p. 23). Williams could not recall telling other employees he was quitting his job. (*Id.*) Williams testified that Dawson wanted his resignation:

> A: Him [Dawson] and Hector had me cornered in the kitchen area and they was both screaming at me, give us your resignation, and that's when I felt threatened and I was backed into a corner by two employees.
>
> Dave Dawson, he doesn't ask for nothing. No. He was just screaming his head off at me. He just didn't know what – you know, I wasn't resigning and I wasn't quitting. Man is trying to grab me. I'm just trying to get away from you before something happens. I'm trying to quell the situation by me taking points off my record to get away from you.

(*Id.*)

> Q: Okay, when Mr. Dawson asked you if you were quitting, did you say I'm sick of your ass, let's do it?
>
> A: Yeah, I told him – I told him he literally made me sick. I literally told him he makes me sick.
>
> Q: Did you have tools in your hand during this conversation?
>
> A: I had stuff, a couple things out my locker, like screw drivers and stuff like that. No big crowbar.
>
> Q: Okay. What did you have in your hands?
>
> A: I had a screwdriver, I had a Stanley knife, I had a nail puller, and I had my laser level, because my waterline in my house broke and my corner -- corner of my porch sunk down almost two-and-a-half foot. It almost crashed on the ground. I had to re-block it up, so I needed some specialty tools to get it back in order. So I needed these for the weekend. My tools are at work.
>
> . . . .

Q:     Did you bang anything on the steel railing as Dawson and Hector were walking down the stairs?

A:     Dave Dawson turned around to scream at me one more time and I had a nail puller about this big.  I smacked it on the railing and I said you literally make me sick.  And that's all that happened right there.  Then he went running like a little girl, Tom, Tom.  And it was, like, you can't handle a man situation.  Why are you in my face six times in four hours?

Q:     Well, he wasn't in your face as he was walking down the steps, was he?

A:     Well, no, I made sure Hector was between us.  I put space between us.  They wanted me to go first and they wasn't pushing me off that 24  - - two-and-a-half foot story set of steps.  So Dave was holding the door saying come on, come on.  I said, no.  I said, you go.  I said, I will go with you to your office, no problem.  Then I said, come on, Hector, let's go.  So I created space between me and Dave, because I didn't want him to turn around and punch at me after being - - you know, and my mindset right there was like, hey, dude, six times you tried to grab me in four hours.  I'm putting space between - - even if I walked with him, I would wait till he got to the bottom of the steps and I would walk out –down then.

(*Id.* at p. 24).  Upon descending the stairs, Williams sat down in a golf cart and waited.  Another supervisor, Tom Meredith, approached him along with an off-duty police officer and advised Williams he was suspended until further notice.  Williams then left the premises and went home.  (*Id.* at p. 25).

Dawson's account of the incident was as follows:

A:     I came in and did my regular duties.  I check in with the guys.  I got caught up with something on my desk that I needed.  I had to get away from my desk at approximately 9:30 in the morning.  I went down walking through the plant and went to the balers' area and I saw Jim.  I do believe it was around the balers' conveyer and feed, and I had walked up to Jim and asked him what he was doing.  And he told me to get out of his face and then I approached Jim again, as he started walking away.  And he told me to leave him alone, to get out of his face.

So I went up to the - - I left that area and went up to the operator's station and I spoke with the operator about, you know, how the operation of the balers was going.  I left that area.  I was going back through the plant up to the shop.  I had been spoken to by a couple of different people, did you know James was quitting.  Doug was one of those people.  I do believe Doug Mulligan was one of those people and Hector Munos.  As I was going back to the shop, I ran into Tom Meredith and Hector Munos and I mentioned to Tom about James quitting.  So Tom Meredith asked me if James was filling out a letter of resignation, then, if he was quitting.  If that is what you heard.

So I then asked Hector if he would go up to the maintenance department with me to speak with James. I was not sure if James was up there. When I first went into the shop, you know, I was - - James, you know, saying, James out loud, to see if he was in the shop area. He was not in the shop area. So I then went upstairs to their break room area. When I opened up the door, me and Hector, I walked in the room and James was not there. I peeked around the corner into their locker room and James was in their locker room. I asked James if he would come out in this room and I would like to speak to him.

And I asked James if it was true, I heard that you are quitting, and he said, did you hear that from me. And I said no, But I need to know if that statement is true. If you are quitting I need you to fill out a letter of resignation, and he was upset. Then he said, I'm sick of your ass. Let's go do it. So I left the room and Hector was behind me as I started down the stairway. I heard this loud bang on the guard rail. I left the area. He never looked back. I was concerned for my safety, and when I got outside I think I ran into Tom Meredith and I told him what had happened, real briefly. So then I left and I went up front to get security, the on-duty police officer, And then we went back and spoke with James.

(Doc. No. 36-3 at pp. 6-7).

The Union steward, Robert Vasquez testified that he was summoned to speak with Williams before Meredith and the police officer arrived.

Q:      Do you remember the discussion and what went on when you got there?

A:      For me to go upstairs and try to calm Jim down and from what they told me to ask him what happened. They said he was being mad, I guess.

Q:      All right. And when you got there did you have a discussion with Jim Williams?

A:      Yes.

Q:      Okay. And what did you observe about him at that time?

A:      That he had his work clothes on. He had a wrench in his hand and that he was upset because of what – his supervisor was wanting to talk to him and he didn't want to talk to the supervisor.

Q:      Okay. And his supervisor at the time was Dave Dawson; is that correct?

A:      Yes.

Q:      Okay. Do you remember any specifics of what he said the supervisor was doing or saying to him?

A:      Just that he was following him and he wouldn't leave him alone.  That is what he was upset about and what he told me is why he was mad.  He wouldn't leave him alone.  He kept saying, what's wrong.  Get away from me.

(Doc. No. 36-8 at p. 2).  After Williams settled down, Vasquez reported:

A:      Well, then he wanted me to go to talk to the manager and tell them that he was done.  If they would just leave his unemployment alone and he will go his way and they go their way and just call it over.  They would be done.

(*Id.*)  Vasquez also advised him of the suspension and that he had three days to file a grievance.  (*Id.* at p. 3).  Meredith arrived with the off-duty police officer.  Vasquez advised Meredith of Williams' wishes.  (*Id.* at p. 2).  Williams was suspended and left the premises.

After Williams went home, he experienced symptoms he believed to be a heart attack.  He proceeded to St. Charles Hospital and was admitted into the psychiatric ward for four days.  (Doc. No. 36-9 at pp. 25-26).    Dawson testified that Debra Williams, Mr. Williams' wife, called in his absence on September 18th, indicating he had been admitted to the hospital.  (Doc. No. 36-3 at p. 7).

After this incident, HR Manager Zsiros conducted an investigation in which she interviewed Dawson and Munoz.  She asked Munoz to write his account of the September 17th incident.

Williams was diagnosed with adjustment disorder and placed on several medications.  Zsiros acknowledged receiving a facsimile from Mr. Williams' doctor seeking short-term disability.  (Doc. No. 36-10 at p. 10).

On September 25,  Zsiros called Williams to discuss the incident.  During the telephone interview, Zsiros was concerned at Williams' agitated state and troubling statements, including:

- "I am going to kill that guy (David Dawson) when I see him."
- "I almost hit him in the face with a crowbar."

- "This is the same day that someone went into work and killed 17 people. I don't want that to happen so I need to stay away."

(Doc. No. 36-11 at ¶ 7). Williams also complained about asking Dawson to get away from him and grabbing people. Zsiros talked to Williams' co-workers about Dawson's actions but was unable to find any corroborating conduct. (Doc. No. 36-10 at pp. 23-24).

After Zsiros spoke with Williams on September 25, she spoke with management. A decision was made to terminate Williams' employment. (*Id.* at pp. 26-28). The next day a conference call to Williams was put together by Zsiros and included the plant manager, Kinsman, the union representative, Vasquez, among others. Zsiros explained the options on leaving the company, either resignation or termination, to Williams. She advised Williams that OmniSource would not contest his seeking unemployment benefits. (*Id.* at pp. 29-30). Zsiros stated Williams became agitated at her comment and hung up on the conference call. (*Id.* at pp. 31-32).

After the call ended with Williams, Zsiros stated that the business agent, Norm Lewallen suggested getting a temporary protection order noting a potential workplace safety issue. (*Id.* at pp. 33-34). Zsiros and Dawson then filed a police report and obtained a temporary protection order to prevent Williams from coming onto OmniSource property. (Doc. No. 36-11 at ¶ 10).

Williams was notified by a letter, dated October 1, 2013, of his termination effective September 26, 2013. (Doc. No. 36-9 at p. 120). He set up a meeting with the Union's business representative, Norm Lewallen at Lewallen's office. Williams went to the Lewallen's office but never met with Lewallen. Williams did not file a grievance.

## IV. OmniSource and Dawson's Motion for Summary Judgement

### A. Assault and Battery

Under Ohio law, assault and battery is defined as "the willful threat or attempt to harm or touch another offensively, [where that] threat or attempt reasonably places the other in fear of such contact." *Harris v. United States*, 422 F.3d 322, 330 (6th Cir. 2005) (citations omitted). An assault

constitutes the beginning of the act, which completed, constitutes battery. *See Love v. City of Port Clinton*, 37 Ohio St.3d 98, 99 (1988). Assault requires the actor knew with substantial certainty their act would bring about harmful or offensive contact. *Smith v. John Deere Co.*, 83 Ohio App.3d 398, 406 (1993). "Contact which is offensive to a reasonable sense of personal dignity is offensive contact." *Love*, at 99, citing Restatement of the Law 2nd, Torts at Section 19.

There is no dispute Dawson touched or tapped Williams on the shoulder to get his attention on more than one occasion. Angelo Alfaro, Williams' former co-worker testified Dawson touched employees in order to get their attention. Williams conceded he did not like being touched but agreed Dawson did not engage in slapping, punching, or kicking. Williams testified that Dawson should not have put "his hands on me," emphasizing, "[y]our employees, you don't touch your employees." (Doc. No. 36-9 at p. 109). Williams did not complain about Dawson's behavior to other employees or the HR manager.

At the September 13 incident, Jon Kinsman testified Dawson touched Williams to get his attention on a safety issue. According to Dawson, Williams told him not to touch him and recalled one other occasion in which he attempted to get Williams' attention while in his work area. (Doc. No. 36-3 at pp. 14-15).

Placing one's hands on someone's shoulder to get their attention does not constitute an assault and battery. *See Rice v. Reed*, 117 N.E.2d 183, 66 Ohio Law Abs. 385 (1951) (evidence disclosing merely that defendant placed hands on plaintiff's shoulder was insufficient to warrant submitting case to jury). In the context of the workplace and under the circumstances presented, tapping one's shoulder to get their attention in a noisy setting does not rise to a willful and harmful touching. *Monrean v. Higbee Dept. Stores, Inc.*, No. 99-T-0099, 2001 WL 20808 *5 (Ohio App. 2000) (contact that is offensive to a *reasonable* sense of personal dignity may be deemed offensive contact), citing *Love*, 37 Ohio St.3d at 99. In addition, there is no evidence Dawson intended to injure

Williams.  *See e.g. Matlock v. Ohio Dept. of Liquor Control*, 77 Ohio Misc.2d 13, 18 (1996) (intent to inflict injury is an essential element to assault and battery).

As Williams is unable to establish a viable cause of action for assault and battery based on the evidence presented, I find the Defendants are entitled to summary judgment on this claim.

## B.  Negligent Hiring, Detention, and Supervision

To establish a claim for negligent hiring, retention, and supervision, a plaintiff must demonstrate:  "(1) the existence of an employment relationship; (2) the employee's incompetence; (3) the employer's actual or constructive knowledge of such incompetence; (4) the employee's act or omission causing the plaintiff's injuries; and (5) the employer's negligence in hiring or retaining the employee as the proximate cause of his injuries." *Retuerto v. Berea Moving Storage and Logistics*, 28 N.E.3d 392, 404 (Ohio App. 2015) (citation omitted).  Establishing evidence as to each factor is necessary to survive a summary judgment challenge.

The harassment alleged by Plaintiff includes Dawson tapping him on his shoulder or following him around to question him on what he was doing.    Mr. Alfaro testified he saw Dawson following Williams on one occasion but that Williams never complained about being harassed. While the behavior by Dawson may have constituted annoying or unprofessional behavior, it does not rise to the level of incompetence for purposes of a negligent hiring and supervision claim. *Beckloff v. Amcor Rigid Plastics, USA, LLC*, __N.E.3d__, 2017 WL 2709808 at *10 (Ohio App. Jun. 23, 2017).   *But see Kerans v. Porter Paint Co.*, 61 Ohio St.3d 486, 493 (1991) (finding sexual harassment to be per se incompetent behavior).

Assuming *arguendo* that Dawson's conduct rose to the level of harassment, there is insufficient evidence presented that OmniSource was aware or should have been aware of this "harassment."  Williams did not complain to HR or co-workers about this behavior.  Nor does the Plaintiff present any evidence that OmniSource should have been aware of Dawson's alleged

propensity of harassing behavior.  *See Herndon v. Torres*, 249 F.Supp.3d 878, 888-89 (N.D. Ohio 2017).

As the Plaintiff's evidence falls short on several of these factors, the Defendants are entitled to summary judgment on this claim.

## C.  Disability Discrimination under the ADA and Ohio Law

A claim for a perceived disability exists under the Americans with Disabilities Act, 42 U.S.C. § 12112(a) and Ohio Revised Code § 4112.02(A).  Both the ADA and Ohio statute prohibit discrimination based upon a disability.  Federal and state claims are considered in tandem on this issue.  *See Knapp v. City of Columbus*, 192 Fed. Appx. 323, 328 (6th Cir. 2006).  The burden-shifting framework under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-06 (1973) is the analysis implemented in a discrimination cause of action.

To establish a *prima facie* case of discrimination, Williams must establish that OmniSource (1) regarded him as disabled; (2) he was otherwise qualified for the job, with or without reasonable accommodation, and (3) he suffered an adverse action because of his disability.  *Johnson v. University Hospitals Physicial Services*, 617 Fed. Appx. 487, 490-91 (6th Cir. 2015), citing *Demyanovich v. Cadon Plating & Coatings, L.L.C.*, 747 F.3d 419, 433 (6th Cir. 2014).  Assuming a *prima facie* case can be established, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for its action.  If the defendant can meet this factor, the burden shifts back to the plaintiff to establish the proffered reason was a pretext for discrimination.

As noted by the Sixth Circuit in *Johnson*, "[A] person is 'regarded as' disabled within the meaning of the ADA if a covered entity mistakenly believes that the person's actual, nonlimiting impairment substantially limits one or more major life activities."  617 Fed. Appx. at 491, quoting *Murphy v. United Parcel Serv., Inc.*, 527 U.S. 516, 521-22 (1999).

Here, Williams' amended complaint states:

Defendant perceived him as having a disabling mental disease.  Plaintiff states that the harassment he endured from Dawson caused Plaintiff great anxiety, which

Defendant perceived as a disability. After the September 17, 2013 harassment and assault by Dawson, Plaintiff suffered a panic attack and was hospitalized for four days. Following his hospitalization, Defendant OmniSource terminated Plaintiff allegedly because he was menacing to other workers.

(Doc. No. 24 at ¶ 25).

Williams' claim of being "regarded as" having a disability is undermined by timing and his own conduct. First, Williams' hospitalization occurred *after* his suspension by OmniSource. It is undisputed that Debra Williams, his wife, contacted Dawson to advise her husband had been hospitalized following the September 17th incident.

Next, Williams' conversation with the HR Manager Zsiros on September 25 raised continued concerns about workplace safety such that she conferred with management and the decision was made to terminate Williams' employment. In a conference call with Williams on September 26, Zsiros offered him an opportunity to resign and indicated the Defendant would not challenge unemployment benefits. Williams became angry and hung up on the call. At the time of Williams' suspension, he told the Union representative, Vasquez, that he was ready to be done.

Third, an employee's illness or incapacity does not automatically translate to a disability. As noted by this Circuit, an "employer's perception that health problems are adversely affecting an employee's job performance is not tantamount to regarding that employee as disabled." *Johnson*, 617 Fed. Appx at 491, citing *Sullivan v. River Valley Sch. Dist.*, 197 F.3d at 810.

Based on the record before me, I do not find the Defendant perceived Williams as disabled. *See Neely v. Benchmark Family Servs.*, 640 Fed. Appx. 429, 436-36 (6th Cir. 2016) ("it is not enough that the employer is simply aware of the plaintiff's symptoms, rather the plaintiff must show that the employer regarded the individual as 'impaired' within the meaning of the ADA") (citation omitted). The Plaintiff's express wish at the time of his suspension was that he "was done," and this information was conveyed to the HR Manager. Williams' misconduct and resulting suspension does not exempt him from the Defendant's workplace rules. *See Dockery v. City of Chattanooga*, 134

F.3d 370 at *3 (6ᵗʰ Cir. 1997) ("[e]mployers must be allowed to terminate their employees on account of misconduct 'irrespective of whether the employee is handicapped' ") (citations omitted).

Therefore, as Williams is unable to establish a prima facie case of disability discrimination, the Defendant is entitled to summary judgment on this branch of its motion.

## D. Negligent and Intentional Infliction of Emotional Distress

Ohio recognizes independent causes of action for negligent infliction of emotional distress and intentional infliction of emotional distress. *Winkle v. Zettler Funeral Homes, Inc.*, 182 Ohio App.3d 195, 206 (2009). The elements of negligent infliction of emotional distress include: (1) the plaintiff experiencing a real or impending danger; (2) the defendant's conduct negligently caused the dangerous incident; and (3) the defendant's conduct was the proximate cause of the serious and reasonably foreseeable emotional distress. *Paugh v. Hanks*, 6 Ohio St.3d 72, 80 (1983). The elements of intentional infliction of emotional distress include: (1) the defendant intended to cause serious emotional distress; (2) that defendant's conduct was extreme and outrageous; and (3) the defendant's conduct was the proximate cause of the resulting serious emotional distress. *Phung v. Waste Mgmt.*, 71 Ohio St.3d 408, 410 (1994).

The conduct at issue involves claims of assault and battery, false statements in a police report, and being escorted off the Defendant's premises by an off-duty police officer.

Ohio's Sixth District Court of Appeals recently addressed conduct underlying a claim sounding in intentional infliction of emotional distress:

> [M]ajor outrage is essential to the tort; and the mere fact that the actor knows that the other will regard the conduct as insulting, or will have his feelings hurt, is not enough. Only conduct that is truly outrageous, intolerable and beyond the bounds of decency is actionable; persons are expected to be hardened to a considerable degree of inconsiderate, annoying and insulting behavior. Insults, foul language, hostile tempers, and even threats must sometimes be tolerated in our rough and tumble society. (Internal citations omitted.)

*Beckloff v. Amcor Rigid Plastics USA, LLC*, __N.E.2d__, 2017 WL 2709808 at *9 (Ohio App. June 23, 2017) (citation omitted).

Having determined Dawson's conduct did not constitute assault and battery, I do not find his conduct to be outrageous or intolerable. The same is true for the statements in the police report as Williams testified he hit the steel railing with one of his tools. His animosity towards Dawson was reflected in his discussion with the HR Manager in their conversation of September 25, 2013. In addition, the termination of employment in this circumstance does not rise to the level of outrageous conduct. *See Beckloff,* 2017 WL at *9-10 (no outrageous behavior where employee was counseled about his performance, his supervisor did not physically assault him, but the employee was ultimately terminated).

Accordingly, Defendants OmniSource and Dawson are entitled to summary judgment on this claim as a matter of law.

## E. Defamation

"Defamation is a false publication that injures a person's reputation, exposes him to public hatred, contempt, ridicule, shame or disgrace; or affects him adversely in his trade or business." *Sygula v. Regency Hosp. of Cleveland E.*, 64 N.E.3d 458, 465 (Ohio App. 2016) (citation omitted). To establish defamation a plaintiff must set forth the following elements: "(1) a false and defamatory statement concerning another; (2) an unprivileged publication to a third party; (3) fault amounting to at least negligence on the part of the publisher; and (4) the existence of special harm caused by the publication." *Graham v. Best Buy Stores, L.P.*, 298 Fed. Appx. 487, 498 (6th Cir. 2008). A qualified privilege exists as follows:

> [C]ircumstances exist, or are reasonably believed by the defendant to exist, which cast on him the duty of making a communication to a certain other person to whom he makes such communication in the performance of such duty, or [where] the person is so situated that it becomes right in the interests of society that he should tell third persons certain facts, which he in good faith proceeds to do. *A & B-Abell Elevator Co. v. Columbus/Cent. Ohio Bldg & Constr. Trades Council*, 73 Ohio St.3d 1, 651 N.E.2d 1283, 1290 (1995); *see also Parry v. Mohawk Motors of Mich., Inc.*, 236 F.3d 299, 313 (6th Cir. 2000).

*Id.* Where a qualified or conditional privilege exists, the burden shifts to the plaintiff to establish the defamatory statements were made with "actual malice." *Lakota Loc. School Dist. Bd. of Edn. v. Brickner*, 108 Ohio App.3d 637, 647 (1996).

In his amended complaint, Williams contends he was falsely accused of: (1) "menacing" in a police report; (2) banging a metal crowbar against a railing; (3) threating to "kill that guy [Dawson] when he sees him,"; (4) threatening to hit Dawson in the face with a crowbar; and (5) referencing mass shooting incidents when speaking with the HR Manager. (Doc. No. 24 at ¶ 33). The defamatory statements alluded to are contained in the police report of September 25, 2013. (Doc. No. 36-9 at p. 121-22).

At the time of the September 17 incident, Williams was suspended and escorted from the premises due to threatening behavior towards Dawson. In his deposition, Williams acknowledged hitting his tool on the railing as he walked behind Dawson and another supervisor. Williams denied making threatening statements towards Dawson or alluding to mass shootings during his conversation with the HR Manager on September 25.

As Williams' employer, OmniSource had concerns about workplace violence and suspended the Plaintiff on September 17. An investigation was conducted by the HR Manager during Williams' absence. Zsiros spoke with Williams on September 25 for approximately 29 minutes about the incident and a plan to move forward. During a conference call with Zsiros the following day, Williams was given a choice between resigning and being terminated, at which time he became agitated and hung up on the call. It was after this call that Zsiros and Dawson met with the OmniSource off-duty police officer.

The record before me supports a privilege argument. Statements to law enforcement which "bear some reasonable relation to the activity reported" are deemed privileged. *Lasater v. Vidahl*, 979 N.E.2d 828, 831 (Ohio App. 2012) citing *DiCorpor Inc. v. Sweeney*, 69 Ohio St.3d 497, 506 (1994). The burden shifts to Williams to establish that the defamatory statements were made with "actual

malice." As the Plaintiff has failed to establish the statements were made by the Defendants with actual malice, the Defendants are entitled to judgment on the claim of defamation.

## F.   Invasion of Privacy

Ohio recognizes a common-law action for invasion of privacy under either a false light invasion theory or one of unreasonable intrusion. As the Plaintiff's amended complaint and response to the summary judgment motion focus on the false light invasion variant, I analyze the Defendants' motion under that theory.

The Supreme Court of Ohio characterizes a claim for false light invasion of privacy as follows:

> One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of privacy if (a) the false light in which the other was placed would be highly offensive to a reasonable person and (b) the actor had knowledge of or acted with reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed. (Restatement of the Law 2d, Torts (1977), Section 652E, adopted.)

*Welling v. Weinfeld*, 113 Ohio St.3d 464 at syllabus (2007). The *Welling* Court also recognized the difficulty in proving a false light claim. *Id* at. 471.

In his amended complaint, Williams alleges the "Defendants held Plaintiff in a false light and/or wrongfully intruded into his private activities in such a manner as to cause outrage or mental suffering, shame, humiliation to a person of ordinary sensibilities. Defendants invaded Plaintiff's privacy to his damage." (Doc. No. 24 at ¶ 39). Williams argues publicizing an attack on another employee impairs his ability to be hired by a new employer. Additionally, the Plaintiff contends he was greatly offended and damaged by the public remarks in the police report, which is available as a public record. I disagree.

Publicity has been defined in the following manner:

> [T]he matter is made public, by communicating it to the public at large, or to so
> many persons that the matter must be regarded as substantially certain to become
> one of public knowledge. The difference is not one of the means of communication,
> which may be oral, written or by other means. It is one of a communication that
> reaches, or is sure to reach, the public.

*Id.* at 471-72, citing Restatement of the Law 2d, Torts, Section 652D, Comment *a*. While a police

report is available to those seeking that information, I do not find it is a communication that is

necessarily certain to reach the public. *See Linetsky v. City of Solon*, Case No. 1:16-cv-52, 2016 WL

6893276 *15 (N.D. Ohio 2016).

Assuming the police report is considered certain to reach the public, the statements therein

are subject to a qualified privilege as they concerned matters of a common business interest and

were relevant to the safety of their employees. *See Evely v. Carlton Co.*, 4 Ohio St.3d 163, 165 (1983).

*See also Lasater v. Vidahl*, 979 N.E.2d at 831. Finally, the Plaintiff has failed to establish the

statements made in police report were objectively false. *See Dautartas v. Abbott Laboratories*, 2012-

Ohio-1709, 2012 WL 1344030 *15 (Ohio App. 2012).

For these reasons, the Defendants are entitled to summary judgment on the invasion of

privacy claims.

## V. OmniSource and Local 20's Motions Regarding The Hybrid Claims

### A.      The Claim Against OmniSource-Breach of Contract

Under Section 301 of the Labor-Management Relations Act, an employee may bring an

action against his employer for breach of the contract and simultaneously institute suit against a

union for breach of the duty of fair representation in a hybrid action:

> Such a suit, as a formal matter, comprises two causes of action. The suit against the
> employer rests on § 301, since the employee is alleging a breach of the collective
> bargaining agreement. The suit against the union is one for breach of the union's
> duty of fair representation, which is implied under the scheme of the National Labor
> Relations Act. "Yet the two claims are inextricably interdependent. 'To prevail

against either the company or the Union, . . . [employee-plaintiffs] must not only show that their discharge was contrary to the contract but must also carry the burden of demonstrating a breach of duty by the Union.' " *Mitchell*, 451 U.S. at 66-67, 101 S.Ct. at 1565-1566 (Stewart, J., concurring in the judgment), quoting *Hines*, 424 U.S. at 570-571, 96 S.Ct. at 1059.

*DelCostello v. Int'l Bhd. of Teamsters*, 462 U.S. 151, 164 (1983).

In this case, OmniSource seeks summary judgment on the hybrid action as Williams failed to file a grievance as required by the CBA. The Plaintiff charges OmniSource terminated him in violation of the company's work rules and without a hearing.

OmniSource's employee guideline sets forth a list of 35 categories of prohibited conduct. One of those categories includes "[t]hreatening, fighting or instigating a fight on Company premises." (Doc. No. 36-9 at p. 67-68). The guidelines on work rules also state "[a]n employee who fails to maintain proper standards of conduct or who violates any of the following rules shall be subject to disciplinary action, up to and including termination." (*Id.*)

The CBA between OmniSource, Toledo Yard Division and Local 20 addresses the grievance procedure as follows:

ARTICLE VII

GRIEVANCE PROCEDURE

Section 1. Grievance Procedure. Should differences arise between the Company and the Union or any employee of the Company as to the meaning or application of the provisions of this Agreement, such differences shall be settled in the following manner:

Step 1. The aggrieved employee or employees shall take their grievance up with their supervisor within three (3) working days of its occurrence. Employees may have the Shop Steward present on any grievance. If a satisfactory settlement is not effected with the supervisor within three (3) working days, the employee shall submit such grievance to the Chief Steward in writing within three (3) working days of the supervisor's answer.

Step 2. If no satisfactory adjustment is agreed upon, the matter shall be referred by the Chief Steward to the General manager of the Company or some other executive officer of the Company, with authority to act, who shall review the alleged grievance and offer a decision within ten (10) working day after receipt of the same and shall give its answer in writing to the Chief Steward and Grievant.

. . . .

Section 2. If such claim or controversy *is not submitted to the Grievance* Procedure within three (3) working days after the happening (or knowledge thereof) giving rise thereto, *such claim, dispute, or controversy shall be considered as barred* and completely disposed of both from the standpoint of the Union and the affected employee or employees. However, *appeal from discharge must be made in writing with a copy to the Company and one to the Union within three (3) working days.*

Section 3. Since the parties have hereby provided for the sole and exclusive method by which to resolve their differences, there shall be no strikes, slowdowns, lockouts or work stoppage of any kind during the term of this Agreement.

Section 4. No employee shall be discharged, except for dishonesty, being under the influence of liquor, illegal drugs, or possession or firearms and/or deadly weapons, without first being given a hearing by the Company, with a representative of the Local Union.

(Doc. No. 36-9 at pp. 88-89). (Emphasis added).

Under the terms of the CBA and in order to challenge OmniSource's decision to suspend or terminate him, Williams had to avail himself of the grievance procedure. He failed to do so.

Even assuming he filed a timely grievance, Williams has not established that OmniSource breached the contract. OmniSource's employee guideline expressly warns of disciplinary action for disobeying proper standards of conduct, "up to and including termination." (Doc. No. 36-9 at p. 67). Article II of the CBA also speaks to management rights as follows:

Except as explicitly limited by a specific provision of this Agreement, the Company reserves, and shall continue to have, the right to manage the plant and direct the work force in accordance with its judgment including, but not limited to, the rights to reprimand, suspend, discharge, or otherwise discipline employees for cause; . . . .

(Doc. No. 36-9 at p. 80).

In this instance, exhausting grievance procedures is a requirement. *Winston v. General Drivers, Warehouseman & Helpers, Local Union No. 89*, 93 F.3d 251, 255 (6th Cir. 1996). There is no evidence of a grievance being filed after the suspension or termination nor is it argued the grievance would have been futile. Accordingly, I find OmniSource is entitled to judgment as a matter of law on the breach of contract claim.

**B. The Claims Against Local 20-Breach of Duty of Fair Representation**

The duty of fair representation by a bargaining representative includes serving "the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct." *Vaca v. Sipes*, 386 U.S. 171, 177 (1967).

A union's behavior is arbitrary where "the union's behavior is so far outside a 'wide range of reasonableness.'" . . . "as to be irrational." *Air Line Pilots Ass'n Int'l v. O'Neill*, 499 U.S. 65, 76 (1991) (internal citations omitted). Actions constituting bad faith have been characterized as " 'act[ing] with an improper intent, purpose, or motive . . . encompassing[ing] fraud, dishonesty, and other intentionally misleading conduct." *Merritt v. International Ass'n of Machinists and Aerospace Workers*, 613 F.3d 609, 619 (6th Cir. 2010) (citations omitted). The grievance process, however, need not be "error-free." *Garrison v. Cassens Transport Co.*, 334 F.3d 528, 538 (6th Cir. 2003), *cert. denied,* 540 U.S. 1179 (2004).

In his amended complaint, Williams contends he never met with the Union's business agent despite appearing in person at his office and making multiple attempts to reach him by phone. He states that "the Union acted negligently, arbitrarily, and in a perfunctory fashion and in a manner devoid of rational basis." (Doc. No. 24 at ¶ 47).

> After receiving his termination letter, Williams testified as follows:
>
> Q: After receiving this correspondence, did you contact anyone at OmniSource to discuss it?
>
> A: No. Norm Lewallen called me for a meeting about that that following Monday. I forgot which date it would have been, after I received it. Set up an appointment for me to file a grievance over it. I went to the office. I signed the ledger in. He wouldn't come out of his office and I tried to call him ten times after that and he wouldn't return my calls. That's where I failed to have union help and I couldn't understand why my name is not on this as having a meeting about my termination. My name should be on here if we had a formal meeting.
>
> Q: Well, there's nothing in this letter indicating you had a formal meeting, is there?

A: I said I should have had that option.

(Doc. No. 36-9 at p. 32).  Williams further testified:

Q: Who at the company did not let you file a grievance?

A: Bob Vasquez.

Q: Okay.

A: Norm Lewallen.  But they are union officials.

Q: Okay.

A: Norm don't work there.

Q: I understand.

A: Norm is the one that called me up and said meet me Monday and wouldn't come out of his office.  I called him ten times afterwards, and I figured, well - - then I got the letter with his name on it that I was terminated, so why did he even call me?

Q: To your knowledge, did anyone associated with the company, like the supervisors, managers, human resources prevent you from filing a grievance?

A: Bob Vasquez.

Q: Okay.

A: And Norm Lewallen.

(*Id.* at p. 50).  Norm Lewallen testified there was an arranged meeting:

Q: All right.  And do you know how that meeting was set up?

A: I told him to come in my office at 9:00 a.m. and that would be the time we would met with him and discuss what's going on.

Q: Did he call you a few days prior or do you know?

A: That's how we set the meeting up.  He called me.  Until today, I have never seen him.

Q: Okay.  Do you remember talking with him about anything before you called and set up the meeting?

A: Yes.

Q: What do you recall that you said?

A: I told him your time is limited for filling out a grievance and you need to get that done.

Q: Did he make a comment once you told him that?

A: Just, I said, come and see me.

Q: All right. Now, on the day you set for the meeting, did you meet with Mr. Williams then?

A: I was there. He didn't show up.

Q: All right. So you were at the Teamsters hall?

A: Yes.

Q: All right. And your testimony is that Mr. Williams didn't show up at all?

A: Correct.

Q: All right. Did you look for him in the hall at that point or –

A: No.

Q: Okay. All right. And if he were to show up, would there be a receptionist that he would talk to to say that he was there or how would - -

A: There are several people to direct you to the office you got to go to.

Q: Okay. All right. So you're saying no one called you to say he was there, no one directed him to you?

A: No.

Q: Okay.

A: I was just in my office all morning that day.

Q: Okay. Do you have any - - did you have any other contact with Mr. Williams after that day.

A: I don't think so.

Q: Okay. And you're saying that no grievance was ever filed?

A: Correct.

Q: Okay.

A: We keep every signed grievance every filed at our Local. They all go in the same place so.

(Doc. No. 36-6 at p. 3).

There is no dispute that a meeting was set up as between the Union representative and the Plaintiff. Lewallen advised Williams of the timeline in which to file the grievance. There is also no dispute the parties failed to meet. This failure to meet, without more, is not "so far outside a wide range of reasonableness that it is 'wholly irrational.'" *O'Neill*, 499 U.S. at 78. It does not rise to the level of constituting arbitrary conduct by the Union. *See Burneson v. Thistledown, Inc.*, 2007 WL 1339839 *3 (6th Cir. 2007). *See Garrison*, 334 F.3d at 538 ("[m]ere negligence on the part of a union does not satisfy this requirement," citing *United Steelworkers of Am. v. Rawson*, 495 U.S. 362, 372-73 (1990)).

Finally, Williams does not present arguments or evidence that the filing of a grievance would have been futile, thereby relieving him of the grievance procedure. *See Glover v. St. Louis-San Francisco Ry. Co.*, 393 U.S. 324, 330 (1969). Accordingly, I find the Defendant Union is entitled to summary judgment on the breach of duty of fair representation as a matter of law.

## VI. CONCLUSION

For the reasons stated above, Defendants' OmniSource and Dawson's motion for summary judgment (Doc. No. 35) is granted. Additionally, Defendant Local 20's motion for summary judgment (Doc. No. 37) is also granted. This case is closed.


So Ordered.

s/ Jeffrey J. Helmick
United States District Judge